**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| HALLIE BERGEN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>TOMY International, Inc.<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Hallie Bergen ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant TOMY International, Inc. ("TOMY" or "Defendant") and alleges the following based on personal knowledge as to herself, and as to all other matters, upon information and belief, including investigation conducted by her attorneys:

## NATURE OF THE ACTION

1. This is a proposed class action arising from the dangerous design and prolonged concealment of a known defect in the Boon PIVOT Collapsible Toddler Tower Kitchen Step Stools ("Product" or "Toddler Tower"). Specifically, Defendant designed, manufactured, marketed, distributed, and sold the Products with a uniform defect that causes them to tip over during ordinary, foreseeable use, posing a serious risk of injury to young children (referred to herein as the "Defect").

2. Toddler towers, like the Product, are small stepstools that allow toddlers and young children to participate with their parents in the more "adult" tasks of the home that may require use of a table or a counter.

3. According to Consumer Reports: "Toddler towers… give kids the chance to join parents or caregivers at the kitchen counter or wherever they need a boost… Being up high on the same level as their parents, watching and joining in everyday tasks like preparing food, can be beneficial to a child's development."[1]

4. As TOMY tells it, the Toddler Tower is a "sleek answer to your toddler's 'Let me try!' demands."[2]

5. However, unbeknownst to parents, the Toddler Tower is not a "sleek answer" – it in fact contains a latent defect making the towers liable to "tip over while in use, posing a risk of serious injury and death."[3]

6. Parents and caregivers would not have purchased the Toddler Tower had they known it would tip over in use, exposing their toddler to a risk of serious injury and death – or, at minimum, they certainly would not have paid the price premium TOMY charged for this Product.

7. On July 16, 2026, the Consumer Product Safety Commission ("CPSC"), together with TOMY, announced the recall ("Recall") of 116,908 Products. The Products were sold nationwide for approximately $150.00 each between January 2023 and June 2026.

8. However, TOMY's recall does little to make consumers whole: rather than make parents and caregivers whole with a full refund of the product, or a replacement of the product without the latent defect, it instead pushes the onus back on parents to remedy a defect in its *own* product.

---

[1] https://www.consumerreports.org/babies-kids/child-safety/toddler-towers-safety-standards-a4009948838/ (last accessed July 31, 2026).
[2] https://booninc.com/pivot-toddler-tower/ (last accessed July 31, 2026).
[3] https://www.cpsc.gov/Recalls/2026/TOMY-Recalls-Boon-PIVOT-Collapsible-Toddler-Tower-Kitchen-Step-Stools-Due-to-Risk-of-Serious-Injury-and-Death-from-Tip-Over-and-Fall-Hazards (last accessed July 31, 2026).

9. Per the Recall Notice, consumers are to "stop using the recalled tower stools immediately and store them away from children until repaired. Contact TOMY for a stabilizing repair part and installation instructions. The firm will mail the free repair parts directly to consumers."[4]

10. This Recall is insufficient; it does not make parents and consumers whole for purchasing a Toddler Tower they had no reason to know was defective in such a dangerous manner, due to TOMY's omissions. Moreover, it places the onus on parents to fix TOMY's design defect themselves by ordering repair parts from TOMY and installing it themselves.

11. Even worse, at the time of the Recall, TOMY's process for taking in affected products is incomplete. Plaintiff Bergen, attempting to take part in the recall, found the website to be broken repeatedly, unable to take her information, and TOMY responsive only sporadically, and she is left without a date certain as to when she will receive the paltry repair part, and indeed without confidence she will receive one.

12. Now comes Plaintiff Bergen seeking to remedy what TOMY itself would not: making parents and consumers whole for its defective product.

13. Plaintiff Bergen, representing a class of Nationwide and Rhode Island consumers, brings this action against TOMY concerning its omissions about the dangerously defective Toddler Tower, and the insufficient recall and administration thereof, and brings claims for Unjust Enrichment, Breach of Implied Warranty, and violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act.

---

[4] *Id.*

## PARTIES

14. At all relevant times, Plaintiff Hallie Bergen was and is a resident and citizen of Lincoln, Rhode Island, who purchased the Toddler Tower on February 15, 2025 through Amazon for $104.31.

15. Defendant TOMY International, Inc. is a Delaware corporation headquartered in Oak Brook, Illinois. According to information and belief, Defendant or its subsidiaries are involved in the design, manufacturing, marketing, sale, and distribution of the recalled Products.

16. Upon belief or information Defendant directly or through third-party entities, designed, manufactured, distributed, marketed, advertised, and sold the recalled Products online through Target.com, Amazon.com, and Babylist.com.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act because: (1) there are 100 or more putative Class Members; (2) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; and (3) there is diversity because Plaintiff and at least one Defendant are citizens of different states.

18. This Court has personal jurisdiction over Defendant because Defendant is headquartered in this District, does substantial business in this State and within this District, receives substantial compensation and profits from the marketing, distribution, and sale of products in this District, and has engaged in the unlawful practices described in this Complaint within this District.

19. Under 28 U.S.C. § 1391, venue is proper in this District because Defendant is headquartered in this District. Because Defendant's principal place of business is in this District, venue is proper.

## COMMON FACTUAL ALLEGATIONS

### A. TOMY Advertises the Toddler Tower to Parents Omitting its Safety Risk

20. Defendant TOMY International "manufactur[es] high quality products that deliver safety, value and a little TOMY magic."[5] Boon Brands is a subsidiary of TOMY International, and Boon describes its parent company as "a leading global designer, producer, and marketer of a broad range of innovative, high-quality toys as well as nursery products children's toys and nursery products."[6]

21. Among its portfolio of products includes the Toddler Tower, a “learning stool” designed for “toddlers 18 months to 4 years old.”[7]

22. The Toddler Tower is represented as being foldable, so it can be made “flat and tuck away easily;” it has a “lightweight design,” and “gives you an easy way to give your curious child a view of the action.”[8]

23. Under its “Product Details,” TOMY continues to advertise the product as “Easy to Clean,” having “Multi Use” capabilities (i.e., in the kitchen and the bathroom” – and, as might be expected, safety representations.

24. Indeed, TOMY markets the Toddler Tower as being safe:

25. “Engineered for Safety: Non-slip feet help tower stand steady and keep it in place during use; Safety tested and complies with all US regulations.”[9]

26. Parents and caregivers, looking for toddler gear to keep their child engaged and encourage growth – and as well, to spend more valuable time with them in the kitchen doing the

---

[5] https://us.tomy.com/about-tomy/ (last accessed July 31, 2026).
[6] https://booninc.com/about/ (last accessed July 31, 2026).
[7] *See* n.2, *supra*.
[8] *Id.*
[9] *Id.*

"adult" tasks required of parents taking care of young children – view TOMY's representations when making their purchasing decisions.

27. Indeed, parents and caregivers rely on TOMY's representations when purchasing the Toddler Tower, and also rely on TOMY's omissions – what TOMY has not said in relation to its Toddler Tower, such as its dangerous propensity to tip over.

**B. TOMY Recalls the Product, at the Same Time Other Toddler Towers Are Found Unsafe**

28. Prior to TOMY's Recall, other, similar Toddler Tower products were recalled for the exact safety problems that would befall TOMY.

29. One of TOMY's competitors, Simplay3, was made aware of a situation in which a 2-year old tipped and fell while using Simplay3's toddler tower.[10] The incident caused Simplay3 to recall that tower in 2023.[11]

30. In recent years, three other similar toddler towers have been recalled: the Step2 StepUp Sidekick, the Onasti folding stool, and the Cosco Kitchen Stepper.[12]

31. TOMY, as a manufacturer of baby and children's products with significant market share, was as equipped if not more than its competitors to design products safe for children to use and without a tip-over risk. It remained doubly so once like toddler towers were shown to have latent design flaws that would allow toddlers and young children to tip-over on the allegedly "safe" toddler towers.

32. However, TOMY did not reveal the tip-over risk to parents, or take any action to re-design or caution parents of the risk.

---

[10] *See* n.1, *supra*.
[11] *Id.*
[12] *Id.*

33. By the time TOMY recalled the Toddler Tower in July 2026, it had already been made directly aware of 11 reports that the towers were unstable, shifting, or leaning.[13]

34. The recall is for 116,908 products sold for around $150 at Target.com, Amazon.com, and Babylist.com from January 2023 through June 2026.[14]

35. After three years of selling the product in the context of other unsafe Toddler Towers, TOMY admits, too late to parents who have already purchased the Product and have not been warned, that they must stop using the Product immediately, and store them away until repaired.[15]

36. That repair will have to be accomplished on parents' own time and with their prerogative – while TOMY sits on the profits it made from unsuspecting parents.

37. Indeed, as of this filing, TOMY has not even taken the product off of its own website.[16]

### C. TOMY's Recall Fails to Make Consumers Whole, Places the Onus for Its Fault on Parents, and the Recall Remedy, However Paltry, is Itself Illusory

38. Parents reasonably relied on TOMY's misrepresentations and omissions concerning the safety (and lack of danger) of the Toddler Tower when making their purchase. As such, the appropriate remedy in the recall would be to refund parents for the dangerous product in their home.

39. TOMY, however, chooses profits over parents; instead of sending parents their money back, or at least sending them a newly re-designed Toddler Tower without this issue, it

---

[13] *See* n.3, *supra*.
[14] *Id.*
[15] *Id.*
[16] *See* n.2, *supra*.

instead provides a "stabilizing repair part and installation instructions," with the "free" parts being mailed "directly to consumers."[17]

40. After the latent defect within the Toddler Tower, TOMY chooses a patch job that its own customers must install, forcing parents to take time out of their busy lives to contact TOMY directly and seek a repair part.

41. Moreover, once the repair part comes, rather than TOMY itself or a TOMY-selected professional, TOMY asks these same parents to install it itself, modifying the product of their own accord. Such modifications, beyond being an imposition, also erode the value of the Toddler Tower as parents have paid for it; it impacts the design, and may impact other features, such as foldability and cleanliness, that parents selected the Toddler Tower for.

42. Still unbeknownst to parents, however, is the impact this part will have, because TOMY's recall process, despite being announced by the CPSC, continues to leave parents in the lurch.

43. Indeed, though TOMY has a webpage dedicated to the Recall, it only "endeavors to ship orders within 4 weeks," without providing an accurate timetable.[18]

44. Moreover, when parents choose to take part in the recall, they find that the website form does not work; that TOMY takes, on average, a week to respond to each parent; and, that TOMY provides no additional insight into the timeframe in which the part will be received, and fails to instill confidence in trusting parents already deceived by TOMY's misrepresentations and omissions.

45. The recall, even after years of Toddler Tower recalls, fails to make consumers whole after TOMY delivered to them a dangerously defective product, which consumers would

---

[17] *Id.*
[18] https://recall.tomy.com/en/pivot/pivot_determination.html (last accessed July 31, 2026).

not have purchased—or, at minimum, would have purchased for less than the price TOMY purported to charge—had they known the truth.

## PLAINTIFF BERGEN'S ALLEGATIONS

46. Parents, such as Plaintiff Bergen, have learned first-hand the inadequacy of TOMY's recall.

47. Plaintiff Bergen purchased the Toddler Tower for her daughter. She was particularly attracted Plaintiff to the Toddler Tower's foldability and cleanliness, and was unaware of the serious tip-over risks associated with the Toddler Tower at the time of purchase.

48. At the point of purchase, Plaintiff Bergen read and reasonably relied on Defendant's representations that the Toddler Tower was safe to use for her and her family.

49. Had TOMY disclosed the tip-over risks to Plaintiff Bergen, she would not have purchased the product or purchased it on the terms she had.

50. Plaintiff Bergen was made aware of the Recall through Amazon, the retailer she purchased the Toddler Tower from. TOMY did not reach out to her directly.

51. Following the recall notice she received, the day it was announced, on July 16, 2026, Plaintiff Bergen attempted to follow TOMY's instructions and submit a claim for the "stabilizing part" on TOMY's website. But TOMY's recall website was broken: it would not let her place her state of purchase (Rhode Island), and kept returning her to the form to complete it.

52. After four or five attempts, Ms. Bergen emailed TOMY for a repair kit. She did not receive a message back until almost a week later, on July 22, 2026, at which point a representative from TOMY told her that she must use the form – the same one that was broken on TOMY's website – in order to qualify for the recall.

53. Ms. Bergen again tried to take advantage of the recall on the website, but received the same "bounce-back" error multiple times, culminating in a final error message that she had already submitted her items. Not once during this process did Ms. Bergen receive confirmation that she had successfully sent in her product information for a stabilizing part, and she did not trust the recall website.

54. She emailed TOMY again about her issues, and TOMY again waited an entire week to respond to her. At that time, the TOMY representative took Ms. Bergen's information for the recall and then gave her a reference number. But Ms. Bergen remains unsure if her recall information was actually submitted, due to the haphazard response schedule of TOMY and the failure of its Recall website to operate properly.

55. In any event, this recall is insufficient: it fails to give Ms. Bergen any monetary compensation in light of the defective Toddler Tower she purchased, which she would not have at all, or on the same terms, had she known the truth.

56. Instead, Ms. Bergen, like the Class, remains damaged because they relied on TOMY's representations and omissions in making a purchase for their toddler.

## TOLLING AND ESTOPPEL OF THE STATUTE OF LIMITATIONS

57. Defendant has continuously marketed and sold the dangerous Products to unsuspecting customers. It continuously represented that the Products are safe and suitable for use.

58. Defendant affirmatively concealed the existence and scope of the Defect while continuing to market the Products as safe. Plaintiff and Class Members had no reasonable means of discovering the concealed Defect prior to the Recall because the relevant information was exclusively within Defendant's possession.

59. Thus, at all relevant times, Defendant indisputably possessed continuous knowledge of the material dangers posed by the Products, and yet Defendant knowingly continued to allow the sale of the Products. Plaintiff and other Class Members' claims are not time-barred.

60. Moreover, even after the Recall, there is no evidence that news of the Recall Notice reached all Product owners. Indeed, Ms. Bergen was only noticed by her retailer, Amazon.

61. Plaintiff and other Class members could not have reasonably discovered and could not have known facts that would have caused a reasonable person to suspect that Defendant knowingly failed to disclose material information within its knowledge about a dangerous defect to consumers in the United States and elsewhere. Therefore, no potentially relevant statute of limitations should apply.

62. Throughout the time period relevant to this action, Defendant concealed from and failed to disclose to Plaintiff and the other Class Members vital information about the Defect described herein.

63. Defendant kept Plaintiff and the other Class Members ignorant of vital information essential to the pursuit of their claims. As a result, neither Plaintiff nor the other Class Members could have discovered the Defect, even upon reasonable exercise of due diligence.

64. Defendant had a duty to disclose to Plaintiff and the Class Members the true quality and nature of the Product, that the Product has a uniform dangerous Defect, and that it poses safety concerns and is in fact dangerous.

65. Instead, Defendant continued to market the Product as suitable for its intended purpose to further profit from the sale of its popular Product and prevent Plaintiff and other Class members from seeking redress.

66. Plaintiff and the other Class Members justifiably relied on Defendant to disclose the true dangerous nature of the Product they purchased and/or owned because that Defect was not discoverable by Plaintiff and the other Class Members through reasonable efforts.

67. Defendant's affirmative acts of concealment, including its continued marketing of the Defective Product as safe, reliable, and fit for its intended purpose while possessing knowledge of the hazard, further support estoppel and tolling of any applicable limitations period.

## CLASS ACTION ALLEGATIONS

68. Plaintiff brings this action on behalf of herself and the following Classes under Rule 23(b)(3) and 23(c)(4) of the Federal Rules of Civil Procedure:

**Nationwide Class:**

All persons in the United States who purchased the Toddler Towers for personal use and not for resale during the fullest period provided by law.

and

**Rhode Island Sub-Class:**

All persons in Rhode Island who purchased the Toddler Towers for personal use and not for resale during the fullest period provided by law.

69. Excluded from the Class are: (a) any officers, directors or employees, or immediate family members of the officers, directors, or employees of Defendant or any entity in which Defendant has a controlling interest; (b) any legal counsel or employee of legal counsel for the Defendant; (c) the presiding Judge in this lawsuit, as well as the Judge's staff and their immediate family members; and (d) any person who has previously settled claims related to the Defect with Defendant.

70. Plaintiff reserves the right to amend the definition of the Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

71. **Numerosity.** Class Members are so numerous and geographically dispersed that joinder of all Class Members is impracticable. While the exact number of Class Members remains currently unknown, upon information and belief, there are over 110,000 products sold, likely constituting the same, or approximately the same number of putative Class Members. Moreover, the number of members of the Class may be ascertained from Defendant's books and records, as well as third-party retailers.

72. **Predominance of Common Questions of Law and Fact.** Common questions of law and fact exist for all Class Members and predominate over any questions affecting only individual Class Members. These common legal and factual questions include, but are not limited to, the following:

a. Whether the Product contained the Defect alleged herein;

b. Whether Defendant knew or should have known of the Defect;

c. Whether Defendant had to disclose the Defect to consumers;

d. Whether Defendant's representations and omissions were misleading or deceptive;

e. Whether Defendant's conduct was unfair or illegal;

f. Whether Class Members suffered economic injury;

g. Whether Defendant's conduct violates public policy;

h. Whether Defendant's conduct violates the consumer protection statutes alleged herein;

i. Whether Plaintiff and putative members of the Class have suffered an ascertainable loss of monies or property or other value as a result of Defendant's acts and omissions of material facts;

j. Whether Defendant was unjustly enriched at the expense of Plaintiff and members of the putative Class in connection with selling the Toddler Towers; and

k. Whether Plaintiff and members of the putative Class are entitled to monetary damages and, if so, the nature of such relief.

73. **Typicality.** Plaintiff's claims are typical of those of the absent Class Members in that Plaintiff and the Class Members each purchased and used the Product, and each sustained damages arising from Defendant's wrongful conduct, as disclosed herein. Plaintiff shares the aforementioned facts and legal claims or questions with the putative Class Members. Plaintiff and all members of the putative Class have been similarly affected by Defendant's common misconduct alleged herein. Plaintiff and all members of the putative Class sustained monetary and economic injuries including—but not limited to—ascertainable losses resulting from Defendant's deceptive omissions concerning the Product's safety and its ability, as well as the proposed repair remedy's ability, to function as intended.

74. **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the members of the putative Class. Plaintiff has retained counsel with substantial experience in handling complex, class action litigation, including complex questions that arise in this type of consumer protection litigation. Further, Plaintiff and her counsel are committed to the vigorous prosecution of this action. Plaintiff has no conflicts of interest or interests adverse to those of the putative Class.

75. **Insufficiency of Separate Actions.** Absent a class action, Plaintiff and members of the Class will continue to suffer the harm described herein, for which they would have no remedy. Even if individual consumers could bring separate actions, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated consumers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant.

76. **Superiority.** A class action is superior to any other available method for the fair and efficient adjudication of the present controversy for at least the following reasons:

a. The damages suffered by each individual member of the putative Class do not justify the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct;

b. Even if individual members of the Class had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed;

c. The claims presented in this case predominate over any questions of law or fact affecting individual members of the Class;

d. Individual joinder of all members of the Class is impracticable;

e. Absent a Class, Plaintiff and members of the putative Class will continue to suffer harm as a result of Defendant's unlawful conduct; and

f. This action presents no manageability concerns that would impede its treatment as a class action and, in fact, is the most appropriate and efficient method by which

Plaintiff and the members of the putative Class can obtain redress for the harm caused by Defendant's misconduct.

77. In the alternative, the Class may be certified for the following reasons:

a. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication concerning individual members of the Class, which would establish incompatible standards of conduct for Defendant; and

b. Adjudications of claims of the individual members of the Class against Defendant would, as a practical matter, be dispositive of the interests of other members of the putative Class who are not parties to the adjudication and may substantially impair or impede the ability of other putative Class Members to protect their interests.

## CAUSES OF ACTION

## COUNT I
## UNJUST ENRICHMENT/QUASI-CONTRACT
**(On Behalf of Plaintiff and the Nationwide Class, or alternatively, the Rhode Island Sub-Class)**

78. Plaintiff hereby repeats, realleges, and incorporates by reference all preceding paragraphs as though fully set forth herein.

79. Plaintiff brings this Count on behalf of herself and the Nationwide Class, or alternatively, the Rhode Island Sub-Class (the "Class").

80. Plaintiff and the putative Class Members conferred a benefit on Defendant by purchasing the Toddler Tower—payments that Defendant knowingly accepted while aware of the product's defect and unfitness for its intended use.

81. Defendant either knew or should have known that the payments rendered by Plaintiff and Class Members were given with the expectation that the Toddler Tower would have the qualities, characteristics, and suitability for the use represented and warranted by Defendant. As such, it would be inequitable for Defendant to retain the benefit of the payments under these circumstances.

82. By its wrongful acts and omissions described herein, including selling the Toddler Tower, which contained both a Defect and was inoperative for the intended use, Defendant was unjustly enriched at the expense of Plaintiff and putative Class Members.

83. Defendant's wrongful conduct directly caused Plaintiff's detriment and resulted in Defendant's unjust enrichment, as the benefit it received flowed directly from the misconduct alleged in this Complaint.

84. Defendant has unjustly profited from its unlawful, unfair, and deceptive conduct at the expense of Plaintiff and the putative Class Members. It would be inequitable and contrary to principles of justice for Defendant to retain the profits, benefits, and other compensation obtained through the sale of the Toddler Tower, as such enrichment was directly tied to the misconduct alleged herein.

85. Defendant was unjustly enriched by retaining revenues from Class Members' purchases of the Toddler Tower. Such enrichment is unjust and inequitable because Defendant knowingly manufactured, marketed, and sold defective and dangerous Product while omitting material facts, causing Plaintiff and Class Members to purchase the Toddler Tower they otherwise would not have bought had the truth been disclosed.

86. Defendant's conduct allows it to knowingly realize substantial revenues from selling the Toddler Tower at the expense of, and to the detriment of, Plaintiff and Class Members,

and Defendant's benefit and enrichment. Defendant's retention of these benefits violates fundamental justice, equity, and good conscience principles.

87. Under common law principles of unjust enrichment and quasi-contract, it is inequitable for Defendant to retain the benefits conferred by Plaintiff's and Class Members' overpayments.

88. Plaintiff and Members of the Classes seek disgorgement of all profits resulting from such overpayment.

**COUNT II**
**BREACH OF IMPLIED WARRANTIES**
**(On Behalf of Plaintiff and the Nationwide Class, or alternatively, the Rhode Island Sub-Class)**

89. Plaintiff hereby repeats, realleges, and incorporates by reference all preceding paragraphs as though fully set forth herein.

90. Plaintiff brings this Count on behalf of herself and the proposed Nationwide Class, or alternatively, the Rhode Island Sub-Class ("Class").

91. Defendant is and was at all relevant times a merchant involved in the manufacturing, distributing, warranting, and/or selling of the Toddler Tower.

92. The Product was and is, at all relevant times, a "good" within the relevant laws.

93. Defendant knew or had reason to know of the specific use for which the Toddler Tower, as a good, was purchased.

94. Defendant entered into agreements with retailers, suppliers, and/or contractors to sell its Toddler Tower to be used by Plaintiff and the proposed Class Members.

95. Defendant provided Plaintiff and the proposed Class Members with implied warranties that the Toddler Tower was merchantable and fit for the ordinary purposes for which the Toddler Tower was used and sold and was not otherwise injurious to consumers, that the

Toddler Tower would pass without objection in the trade, be of fair and average quality, and conform to the promises and affirmations of fact made by Defendant in its misrepresentations and omissions regarding safety. This implied warranty of merchantability is part of the basis for the benefit of the bargain between Defendant and Plaintiff and Class Members.

96. Defendant breached the implied warranty of merchantability because the Toddler Tower is not fit for its ordinary purpose of being a reasonably safe structure for a young child to use. The Toddler Tower contains the Defect, rendering the Toddler Tower unsafe to use as intended. Therefore, the Toddler Tower is not fit for its particular purpose.

97. As instructed by the Recall Notice, Plaintiff is directed to completely discontinue use of the Product due to the ongoing safety risk of the Toddler Tower tipping over.

98. The aforementioned problems associated with the Toddler Tower constitute safety risks, such that the Toddler Tower is neither safe nor suitable for children to use. Therefore, there is a breach of the implied warranty of merchantability.

99. Moreover, due to the inadequate and overdue nature of the Recall, and Defendant's failure to administer it appropriately, it is not required and would be futile for Plaintiff to provide Defendant further opportunity to cure their breach.

100. Plaintiff and Class Members have had sufficient direct dealings with either Defendant or one of their authorized retailers, representatives, and agents to establish a contract between Defendant, on the one hand, and Plaintiff and each Class Member, on the other hand.

101. Nevertheless, privity is not required because Plaintiff and each Class Member are the intended beneficiaries of Defendant's warranties and its sale through retailers. The retailers were not intended to be the ultimate consumers of the Toddler and have no rights under the warranties provided by Defendant. Defendant's warranties were designed for and intended to

benefit the consumer only, and Plaintiff and Class Members were the intended beneficiaries of the Toddler Tower. Thus, it was reasonably foreseeable that Plaintiff and Class Members would be the intended beneficiaries of the Toddler Tower and its warranties.

102. Defendant impliedly warranted that the Toddler Tower was safe, suitable for children to use, of merchantable quality, and fit for its intended purpose. These implied warranties included, among other things: (i) a warranty that the Toddler Tower manufactured, supplied, distributed, and/or sold by Defendant was safe and suitable to safely support young children during ordinary use; (ii) a warranty that the Toddler Tower would be fit for its intended use while the Toddler Tower is being used; and (iii) a warranty that the Toddler Tower would conform to all of the promises and affirmations of fact on the Toddler Tower's label and online advertising.

103. Instead, the Toddler Tower contains a defective design and/or manufacture, as alleged herein. Defendant failed to adequately warn Plaintiff and Class Members that the Toddler Tower contained the Defect, was not safe or suitable for use, and could and have caused children to tip over, causing serious injuries.

104. Defendant breached the implied warranties because the Toddler Tower was and is sold with the Defect.

105. Defendant's attempt to limit or disclaim any implied warranties is unconscionable and therefore unenforceable.

106. Plaintiff and Class Members had no meaningful choice in determining the terms of that unreasonably favored Defendant, who had superior and exclusive knowledge of the Defect, which existed at the time of sale of the Toddler Tower. A gross disparity in bargaining power existed between Defendant and Plaintiff and the Class Members, and Defendant knew or should have known that the Toddler Tower was defective at the time of sale.

107. Contrary to the applicable implied warranties, the Toddler Tower, at the time of sale and thereafter, was not fit for its ordinary and intended purpose. Instead, the Product suffered, and continues to suffer, from the Defect as alleged herein.

108. Defendant's failure to adequately repair or replace the dangerous Product caused the warranty to fail in its essential purpose.

109. As a direct and proximate result of the foregoing, Plaintiff and the Class Members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

**COUNT III**
**VIOLATION OF RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT**
**R.I. Gen. Laws § 6-13.1-1 et seq.**
**(On Behalf of Plaintiff and the Rhode Island Sub-Class)**

110. Plaintiff hereby repeats, realleges, and incorporates by reference all preceding paragraphs as though fully set forth herein.

111. Plaintiff brings this claim individually, and on behalf of the Rhode Island Sub-Class against Defendant.

112. Defendant TOMY International, Inc. is a "person" under the Rhode Island Unfair Trade Practice and Consumer Protection Act. R.I. Gen. Laws § 6-13.1-1(3).

113. "Trade" and "commerce" under the statute refer to "the advertising, offering for sale, sale, or distribution of… any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situate, and include any trade or commerce directly or indirectly affecting the people of this state." *Id.* at (5).

114. The Rhode Island Unfair Trade Practice and Consumer Protection Act declares unlawful deceptive acts or practices in the conduct of any trade or commerce. R.I. Gen. Laws § 6-13.1-2.

115. Such acts include:

a. "representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" R.I. Gen. Laws § 6-13.1-1(vii)

b. "Engaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding;" *Id.* at (xii)

c. "Engaging in any act or practice that is unfair or deceptive to the consumer;" *Id.* at (xii)

d. "Using any other methods, acts, or practices that mislead or deceive members of the public in a material respect;" *Id.* at (xiv).

e. "Advertising claims concerning safety, performance, and comparative price unless the advertiser, upon request by any person, the consumer council, or the attorney general, makes available documentation substantiating the validity of the claim;" *Id.* at (xvii).

116. Defendant represented, through its online representations and omissions, that the Toddler Tower was safe for use by children and toddlers, when in reality it had a propensity to tip over dangerously.

117. Defendant withheld from parents and caregivers the Towers' propensity to tip-over, leading parents and caregivers to rely on TOMY's representations and omissions the products were safe for children and toddlers.

118. Defendant never substantiated its claim of safety as present on its website. Where the safety claim appears, there is no reference to any studies done or notes on design that would substantiate its safety. Far from it; the product was recalled for being unsafe.

119. Defendant's representations and omissions are illegal under the Rhode Island Unfair Trade Practice and Consumer Protection Act, as it represents the Toddler Tower as having a particular standard, quality, or grade despite being another; it engages in conduct likely to cause confusion, and that is unfair or deceptive to the consumer; it represents and omits material information about safety such that it misleads members of the public in a material respect; and it advertises a safety claim without available documentation.

120. Under R.I. Gen. Laws. § 6-13.-1-5.2(a), a person suffering ascertainable loss of money as the result of an unlawful act may bring an action in the place in which the seller or lessor has their principal place of business to recover actual damages or five hundred dollars ($500), whichever is greater. The court can award damages three times the amount of actual damages and provide other equitable relief as necessary. *Id.*

121. Under R.I. Gen. Laws. § 6-13.-1-5.2(b), a person entitled to bring an action under subsection (a), where the unlawful act has caused similar injury to numerous others similarly situated and whom adequately represent such persons, may bring an action to recover damages as provided for in subsection (a).

122. Plaintiff Bergen has suffered ascertainable loss in an amount at least equal to the price she paid in reliance on TOMY's misrepresentations and omissions, and brings this action in the principal place of business of TOMY International, Inc.

123. Plaintiff Bergen brings this action as an adequate representative of individuals similarly situated, in that they have all been similarly injured by TOMY's actions.

124. Under this statute, Plaintiff Bergen prays for relief to recover actual damages or $500, whichever is greater, for each individual harmed by TOMY's deceptive misrepresentations

and omissions as they relate to the Toddler Tower; equitable and injunctive relief, and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, respectfully requests that this Court:

1. Declare that this action is a proper class action, certifying the Classes as requested herein, designating Plaintiff as Class Representative and appointing the undersigned counsel as Class Counsel;

2. Award Plaintiff and Class members compensatory, statutory, actual, and/or monetary damages, including interest, in an amount to be determined at trial;

3. Declare that Defendant must disgorge, for the benefit of the Class(es), all or part of the ill-gotten profits they received from the sale of the Product;

4. Order Defendant to pay attorneys' fees and litigation costs to Plaintiff and the other members of the Classes;

5. Award punitive damages where permitted by statute, in an amount to be determined at trial, due to Defendant's willful and reckless disregard for the safety of consumers despite its knowledge of the Defect;

6. Award pre-judgment and post-judgment interest as permitted by law;

7. Order such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all claims so triable.

DATED: July 31, 2026

Respectfully submitted,

/s/ Daniel S. Tomascik
Daniel S. Tomascik

Christopher D. Jennings*
Tyler B. Ewigleben*
Daniel S. Tomascik
**JENNINGS & EARLEY PLLC**
500 President Clinton Avenue, Suite 110
Little Rock, AR 72201
T: (501) 255-8569
Email: chris@jefirm.com
tyler@jefirm.com
dan@jefirm.com

*Attorneys for Plaintiff Bergen and the Class*

**pro hac vice to be submitted*